09 CV 5892

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| SSH HOLDINGS GROUP LTD., on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>SAFRA NATIONAL BANK OF NEW YORK, SIAM CAPITAL MANAGEMENT LTD., BANQUE JACOB SAFRA (GIBRALTAR) LTD., PRICEWATERHOUSECOOPERS ACCOUNTING SERVICES LTD., GERARD F. VILA, MICHAEL L. PATON, and CHARLES G. GALLIANO<br><br>Defendants. | CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>JURY TRIAL DEMANDED |

819862.4

## TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................ 3

THE PARTIES........................................................................................................... 4

CLASS ACTION ALLEGATIONS ......................................................................... 6

SUBSTANTIVE ALLEGATIONS .......................................................................... 8

    I.     Background And Structure Of Zeus .............................................. 8

    II.    Zeus' Purported "Split-Strike Strategy" Was A Fiction ..................... 12

    III.   Defendants Recklessly Missed Or Ignored Numerous Obvious Red Flags Concerning Madoff.......................................................................... 15

          A.    Harry Markopolos' Congressional Testimony............................ 15

          B.    Red Flags About Madoff Were Heeded By Other Finance Professionals But Not By Defendants...................................... 18

          C.    The Financial Press Raised Questions About Madoff's Strategy Years Before His Admissions................................................ 21

          D.    Defendants' Failures And Breaches Of Duty To The Class ................... 24

    IV.   Zeus' Investors Learned Of Madoff's Role In Zeus Only After His Arrest........ 27

    V.    Defendants Failed To Follow Applicable Accounting Standards........................ 29

    VI.   Safra's Denial Of Its Affiliation With Zeus, And Its Subsequent Offer Of Settlement With Zeus Investors .................................................. 33

COUNT I BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS) ................. 35

COUNT II GROSS NEGLIGENCE (AGAINST ALL DEFENDANTS)................................... 37

COUNT III UNJUST ENRICHMENT  (AGAINST ALL DEFENDANTS) ............................. 38

PRAYER FOR RELIEF .......................................................................................... 38

JURY DEMAND....................................................................................................... 39

Plaintiff SSH Holdings Group Ltd. ("Plaintiff"), individually and on behalf of all other persons similarly situated (the "Class"), by Plaintiff's undersigned attorneys, makes the following allegations based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff that are based on personal knowledge. The investigation Plaintiff's counsel conducted included, *inter alia*, a review and analysis of publicly available information, including but not limited to financial reports and marketing materials concerning Zeus Partners Ltd., news articles, press reports, and filings in court proceedings related to the Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"), including complaints filed by the United States Government and Securities and Exchange Commission (the "SEC") against Madoff and his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and proceedings relating to the bankruptcy of BMIS, as follows:

## BACKGROUND

1.      This action arises from a massive, fraudulent scheme perpetrated by Madoff through his investment firm, BMIS, and others, which was facilitated by Defendants named herein, who, out of gross negligence and/or in breach of fiduciary duties owed to Plaintiff and Class members, caused and permitted the Class's assets to be invested with Madoff without performing the requisite due diligence and investigation prior to and during the time those assets were invested with Madoff.

2.      This suit is a class action brought on behalf of all persons or entities who purchased or acquired shares in Zeus Partners Ltd. ("Zeus," the "Company," or the "Fund") between December 1, 2004 and December 11, 2008 (the "Class Period") and were damaged thereby, as described below.   Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

819862.4

3.     Plaintiff and other investors in Zeus entrusted their assets to Defendants who, in turn, invested those assets with Madoff, through BMIS.  On information and belief, the total assets under management in Zeus were estimated to be worth approximately $400 million prior to December 11, 2008.

4.     On December 10, 2008, Madoff confessed to senior employees that he had been operating a Ponzi scheme, and that the accounts at BMIS were essentially worthless. Madoff explained that for years he paid redemptions to certain investors out of the principal received from other, different investors.  Madoff stated that the business was insolvent and that it had been for years.  Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.

5.     On December 11, 2008, the U.S. Attorney brought criminal charges against Madoff and the SEC filed a civil suit, alleging securities fraud by Madoff and BMIS. The Securities Investor Protection Corporation ("SIPC") moved to protect the assets of Madoff and BMIS from dissolution, and commenced proceedings in the bankruptcy court.  A court-appointed trustee is overseeing the liquidation of BMIS's assets and processing claims of customers who held brokerage accounts at BMIS.

6.     On March 12, 2009, Madoff pleaded guilty to eleven felony counts, including (among others) securities fraud, mail fraud, wire fraud, and money laundering, for operating a massive Ponzi scheme since at least the early 1990s.  He faces a maximum sentence of 150 years in prison.

7.     On March 18, 2009, Madoff's longtime accountant, David Friehling, was arrested and charged by the SEC with securities fraud, aiding and abetting investment adviser fraud, and four counts of filing false audit reports with the SEC.  Friehling, through his firm Friehling & Horowitz, was Madoff's accountant from 1991 through 2008.  Although he was

responsible for auditing a business with allegedly $65 billion worth of assets under management, Friehling's firm had only two full-time employees and occupied a tiny (13ft x 18ft) office in Rockland County, New York.

8.   Like those individuals who invested directly with Madoff, investors in Zeus have seen their assets vanish as a result of Defendants' conduct. Defendants (defined below) owed a duty to provide investors with careful due diligence and portfolio management, and to uphold generally accepted accounting principles with respect to the calculation and reporting of the net asset value ("NAV") of investors' shares of Zeus, yet did nothing of the kind.

9.   Various red flags tipped off other investment professionals to the risks of investing with Madoff, but Defendants ignored these warning signs. Defendants conducted no due diligence or due diligence that was grossly negligent and/or reckless. Defendants then failed to monitor Madoff's investment activities and did not ensure that proper controls were implemented to guard against fraud by Madoff and BMIS. Defendants essentially turned over the entire operation of Zeus to Madoff and BMIS and collected fees from Plaintiff and the Class for providing virtually no services of value.

10.   Plaintiff seeks, under the common law, to recover damages caused to the Class by Defendants' gross negligence and breaches of fiduciary duty.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over the claims pursuant to the Court's diversity jurisdiction. 28 U.S.C. § 1332(a).

12.   This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2). With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount, (ii) the Class consists of hundreds, and perhaps

thousands, of individuals, and (iii) Plaintiffs are citizens of foreign states and at least one defendant is a citizen of New York.

13.     Venue in this judicial District is proper under 28 U.S.C. § 1391(b)(2), (b)(3) and/or (d).  A substantial part of the events or omissions giving rise to the claims occurred within this District.  In addition, all of the assets of Zeus, which are the subject of this action, were deposited with and held in custody by BMIS in this District.  Certain of Defendants also maintain offices and/or headquarters and/or conduct substantial business in this District.

## THE PARTIES

14.     Plaintiff SSH Holdings Group Ltd. is a holding company based in the British Virgin Islands.   During the Class Period, Plaintiff invested approximately US $170,000.00 in Zeus which was held in Plaintiff's account at Safra National Bank of New York. Prior to December 11, 2008, Plaintiff's investment in Zeus was reported in account statements from Safra National Bank of New York to be worth over US $230,160.00.  That amount was reduced to zero after Madoff's arrest.  Due to the activities alleged herein, Plaintiff has lost its entire investment in Zeus, and has paid substantial management and administration fees for illusory services.

15.     Defendant Safra National Bank of New York ("Safra New York" or the "Bank") was incorporated in 1987, operates as a subsidiary of Safra New York Corporation, and is part of the Safra Group of financial institutions ("Safra"), an international network of privately held companies controlled by the Safra family.  Safra New York is a member of both the Federal Reserve System and the Federal Deposit Insurance Corporation ("FDIC"), and has its principal offices at 546 Fifth Avenue, New York, New York  10036, where it employs over 200 people. Safra New York engages in private banking and commercial operations, and has provided various investment vehicles and products to its customers including exchange trade and offshore

funds, securities and equity funds, sector and bond funds, asset allocation funds, and hedge and specialty funds. As of June 30, 2005, or just over six months after Zeus' inception, Safra New York reported $1.7 billion in deposits, accounting for 63% of total bank deposits of which 57% came from international customers residing in Latin America. The shares of Zeus purchased or acquired by Plaintiff and a substantial percentage (if not all) of the Class were held in accounts with Safra New York.

16.     Defendant SIAM Capital Management Ltd. ("SIAM") is an investment manager and financial services provider organized under the laws of Bermuda on December 22, 1999, with offices located at 31 Church Street, Hamilton HM12, Bermuda. As described further below, SIAM was the Investment Manager for Zeus during the Class Period.

17.     Defendant Banque Jacob Safra (Gibraltar) Ltd. ("the Safra Custodian"), located at Suite 971, Europort, Gibraltar and/or at 5763 Line Wall Road, Gibraltar, is a banking institution and private subsidiary of Banque Jacob Safra Suisse SA (a subsidiary of Banco Safra SA). As described further below, the Safra Custodian was the Custodian for Zeus during the Class Period.

18.     Defendant PricewaterhouseCoopers Accounting Services Ltd. ("PwC" or the "Administrator"), located at the International Commercial Centre, 10th Floor, Casemates Square, Gibraltar, is part of the network of member firms of PricewaterhouseCoopers International Ltd., which provides auditing and accounting services across the globe and has its principal executive offices in New York. As described further below, PwC was the Administrator, Registrar and Transfer Agent for Zeus during the Class Period.

19.     Defendant Gerard F. Vila, Ph.D. ("Vila") was a member of the Board of Directors of Zeus during the Class Period, and, according to an Executive Summary dated April 2006 for Zeus (the "Executive Summary"), acted as "adviser to the Investment Manager with

primary responsibility for allocating assets managed by the Investment Manager." During the Class Period, according to the Executive Summary, Vila was affiliated with SIAM and used its Bermuda office as his point of contact.

20.     Defendant Michael L. Paton ("Paton") was a member of the Board of Directors of Zeus during the Class Period and, according to the Executive Summary, acted as "adviser and counsel for all legal matters" concerning Zeus. During this time, Paton was a Certified Public Accountant ("CPA") and a partner at the law firm of Lennox Paton, with offices in Nassau, Bahamas and London, where he chaired the firm's Financial Services Group. Also during this time, Paton served as Chairman of the Bahamas Financial Services Board. In his capacity as a Director of Zeus, Paton used the business address of Moore Park Asset Management Ltd. at British Colonial Centre of Commerce, One Bay Street, PO Box CB-10974, Nassau, Bahamas, as his point of contact.

21.     Defendant Charles G. Galliano ("Galliano") was a member of the Board of Directors of Zeus during the Class Period and, according to the Executive Summary, had "extensive experience in company administration in Gibraltar." Prior to serving as a Director of Zeus, Galliano worked for fifteen years at Abacus Financial Services Ltd. in Gibraltar, which was the fiduciary arm of PwC. Galliano's address during the Class Period was 38 Prince Edwards Road, Gibraltar.

22.     Defendants Vila, Paton and Galliano are collectively referred to herein as the "Director Defendants." The Director Defendants, Safra New York, SIAM, and PwC are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or acquired

shares of Zeus between December 1, 2004 and December 11, 2008, and were damaged thereby, to recover damages caused by Defendants' gross negligence and breaches of fiduciary duty. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

24.     Each member of the Class invested in Zeus which, in turn, invested all of its assets with BMIS.

25.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the hundreds.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of all Class members, and Plaintiff does not have interests antagonistic to, or in conflict with, those of the Class. In addition, Plaintiff has retained competent counsel experienced in class action litigation.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the common law.

28.     There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(a)     Whether Defendants' conduct alleged herein was reckless and/or grossly negligent and/or in violation of fiduciary duties owed to Plaintiff and the Class and, therefore, in violation of the common law;

(b)    Whether Defendants were unjustly enriched by their conduct; and

(c)    Whether and to what extent Plaintiff and the Class were damaged.

29.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments.  Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### I.    Background And Structure Of Zeus.

30.    Zeus was incorporated on November 23, 2004, with a date of inception of December 1, 2004, and is a professional fund within the meaning of the British Virgin Islands' ("BVI") Mutual Funds Act of 1996, as amended.  The registered address for Zeus is c/o Harney Westwood & Riegels, Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

31.    According to the Executive Summary, eligible investors in Zeus included those who qualified as "professional investors" under the BVI Mutual Funds Act (1996), as amended, which included those (i) whose ordinary business, whether for its own account or the account of others, is the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Company or (ii) who had a net worth (individually or jointly with a spouse) in excess of US $1,000,000.00.  The Company's policies prohibited the sale or transfer of shares of Zeus to U.S. persons.

32.    Zeus is described in the Executive Summary as a "mutual fund" with an investment objective of "long-term capital appreciation with low volatility."  The Executive Summary explains:

The Company will seek to achieve this objective by utilizing strategies characterized by quantitative discipline and well defined risk profiles.  These strategies will be implemented directly or indirectly by one or more **"Trading Advisors"** selected by the Investment Manager (as defined herein) that have a unique investment style and that have demonstrated their abilities to achieve consistent annual returns under varying economic and market conditions, and not on the basis of their abilities to outperform rising markets. . .

33.    The Executive Summary provided that Zeus' investment strategy was to include a purported "split strike" or "split strike conversion" strategy, as follows:

The Company's initial Trading Advisor will generally utilize a "split strike" strategy in U.S. markets.  This strategy usually employs only:  U.S. Treasury Bills; a basket of "blue chip" stocks (i.e., common stock of U.S. nationally known companies that have a long record of profit growth and dividend payment and a reputation for quality management, products and services) that are closely tracked by the S&P 100 Index; put options on the S&P 100 Index; and call options on the S&P 100 Index.  Generally, whenever the Trading Advisor feels there may be a short term (i.e., over a few hours to a few days) upward move in the market for the basket of stocks, there will be a simultaneous purchase of the "basket" and of S&P 100 puts (for an equivalent notional amount) at a strike nearest to the money. If the market moves upward, the Trading Advisor will sell calls on the S&P 100 (for an equivalent notional amount) at a strike price usually slightly higher than the strike price for the puts. If the market goes down the maximum loss should be limited to the difference between the amount of premium paid for the puts minus the amount of premium collected for the calls plus the gap between the level of the market value of the "basket" at the time the position was initiated and the strike price for the puts.  Because the market has gone down, it is unlikely that the call sold by the Trading Advisor will be exercised by the purchaser and should expire worthless.  If the market goes up to the level of the strike price for the calls, the gain (in percentage) will be equal to the difference between the percentage by which the strike price of the calls exceeds the value of the "basket" when the position was initiated and the net premium paid for the puts after deduction of the premium received on the sale of the calls expressed as a percentage of the amount paid to purchase the stocks.

34.     Defendants also made "fact sheets" concerning Zeus available to Plaintiff and the Class on a monthly basis, with the Safra's logo at the top.  These fact sheets purported to summarize, on one page, Zeus' annual performance data since the date of inception of the Fund, and consistently showed annualized rates of return of 8 to 10%.  The fact sheets included the following description of Zeus:

> The fund implements, among others, a non-traditional investment strategy which is often described as a split-strike conversion.  This underlying strategy which invests exclusively in the United States in highly liquid securities with no leverage consists of either: (i) purchasing equity shares; (ii) selling related out-of-the-money call options which represent a number of underlying shares equal to the number of shares purchased; (iii) buying related out-of-the-money or at-the-money put options representing the same number of underlying shares when the sub-adviser believes the market is due to strengthen; or (iv) remaining in cash or USTB [i.e., United States Treasury Bonds] when the sub-adviser believes the market is due to weaken.

35.     Throughout the Class Period, the sole "Trading Advisor" or "sub-adviser" for Zeus was BMIS.  Defendants did not disclose this fact to Zeus' investors.  The Executive Summary provided that the Trading Advisor would "select one or more brokers and dealers to clear all of their trades (the 'Brokers')."  BMIS, as Trading Advisor, selected itself to act as Broker for Zeus.

36.     SIAM was the Investment Manager for Zeus.  As Investment Manager, according to the Executive Summary, SIAM was to "make all trading and asset allocation decisions on behalf of the Company and . . . be responsible for the overall investment management of the Company."  As described above, SIAM was responsible for selecting the Trading Advisor (i.e., Madoff) for purposes of implementing Zeus' purported investment strategy.

37.     During the Class Period, according to the Executive Summary, the Safra Custodian acted as the Custodian for Zeus.  The Safra Custodian was responsible for

"maintain[ing] an account for the Company and hold[ing] in such account cash, securities and other assets of the Company not otherwise held with the Broker(s)."

38.     During the Class Period, according to the Executive Summary, Zeus was "managed" by its Board of Directors, which consisted of the Director Defendants.

39.     According to the Executive Summary, PwC was the Administrator for Zeus. As Administrator, PwC was responsible for providing "operational support coordinating with the Custodian and/or the Brokers and any other third party administrator to assure (i) collection and reconciliation of manager, custodian or third party valuation data; (ii) calculation of the Net Asset Value of the accounts and calculation of the Net Asset Value per Share on a monthly basis; (iii) follow-up with outside auditors to produce timely annual reports; (iv) deliver [sic] audit and valuation reports to the Investment Manager; [and] (v) prepare [sic] any other reports as may be required by the company."

40.     The Executive Summary provided that the NAV per share of Zeus would be calculated by the Administrator (PwC) on a regular basis, and that the "value of the assets" of Zeus would be "determined on the accrual basis of accounting using generally accepted accounting principles ["GAAP"], US accounting standards or international financial reporting standards ["IFRS"], unless otherwise deemed appropriate in the discretion" of the Director Defendants. Even where such "discretion" was exercised, however, NAV calculation was to be done "in accordance with" a number of "principles." One of these principles included the following:

> The value of positions in Investments shall be as follows:  (i) Investments that are listed on an exchange and are freely transferable shall be valued at their last traded price on such stock exchange on the date of determination; (ii) Investments traded over the counter which are freely transferable shall be valued at the last traded price on the date of determination or at a price received from the counterparty to the over the counter trade. Notwithstanding the foregoing, if a price for an investment is not available or if in the reasonable judgment of the

Director [Defendants] in their sole discretion, the listed price for an investment held by the Fund does not accurately reflect the fair value of such Investment, the Director [Defendants] may value such Investment at a fair price which may be greater or less than the quoted market price, if any, for such Investment.

41.    In other words, even where Defendants, in their "discretion," chose to value the Fund's assets by some manner other than those dictated by GAAP or IFRS, that valuation was supposed to be at a "fair price," as described above.

42.    Investments in Zeus were made through and held in accounts in Safra New York.  Plaintiff and members of the class received monthly statements from Safra New York indicating the prior month's closing balance and the current balance of their investments in Zeus, along with the Company's NAV on a per share basis.

43.    During the Class Period, Safra New York's account representatives actively marketed Zeus to their private banking clients, including Plaintiff and the Class, in emails and other communications as a "Safra fund" that was conservative and carried low risk. As events over the last six months have brought to light, and as Defendants should have known but for their gross negligence and breaches of fiduciary duty, the Fund was neither conservative nor low risk – it was nothing more than a Ponzi scheme.

## II.    Zeus' Purported "Split-Strike Strategy" Was A Fiction.

44.    Madoff, the founder of BMIS, is a former Chairman of the NASDAQ Stock Market.  BMIS is a securities broker dealer with its principal office in New York City. According to BMIS' website prior to December 11, 2008, BMIS was "a leading international market maker. . . providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960."  BMIS claimed "more than $700 million in firm capital," ranking it "among the top 1% of US Securities firms."  BMIS' proprietary trading and market making

activities were run from Madoff's New York City office building at 885 Third Avenue, which is less than one mile (or thirteen city blocks) from Safra New York's offices.

45.     Madoff ran BMIS' investment advisor business on a separate floor of the building at 885 Third Avenue, which, according to an article in *The Wall Street Journal* dated March 9, 2009, was staffed by many employees that "had little or no financial expertise and started working there at a very young age."

46.     According to the criminal information filed recently by the U.S. Attorney for the Southern District of New York, Madoff made his name among the investing public and to "feeder funds" (i.e., funds that, like Zeus, invested with Madoff) by marketing the so-called "split-strike conversion" investment strategy. Information, *United States of America v. Bernard L. Madoff*, 09-cr-213 (S.D.N.Y.) (Mar. 10, 2009) at ¶ 7.

47.     As explained in the recent Congressional testimony of Harry Markopolos ("Markopolos"), described further below, the "split-strike conversion strategy," when actually implemented, consists of three main parts.  Part I is a basket or grouping of stocks purchased by the relevant fund.  Investment managers will often choose to purchase their stocks in index form such that the stock basket is a 100% match to the index options they plan on using as part of the strategy.  Part II is consists of the call options that are sold to generate income.  Part III consists of the put options that are purchased to protect the stock portfolio from market price declines, akin to a form of "insurance."

48.     In sum, there are three sources of income from the split-strike conversion strategy when it is actually implemented:  (1) stock price appreciation among the stocks in the portfolio; (2) quarterly stock dividends paid by certain stocks in the portfolio; and (3) income received from selling out-of-the-money call options.  At the same time, there are three sources of loss from this strategy when it is actually implemented:  (1) declines in stock price among the

stocks in the portfolio; (2) purchasing put options to protect the portfolio from market declines; and (3) a rise in the relevant index, such as the S&P 100 ("OEX"), above the strike price of the fund's short index calls.

49.    As testified to by Markopolos, the split-strike conversion strategy, when implemented, "is complex enough, with enough moving parts, that even market professionals without derivatives experience would have trouble keeping track of all the moving parts and understanding them fully. This is probably why [Madoff] settled on marketing this . . . strategy to his victims. He knew most wouldn't understand it and would be embarrassed to admit their ignorance so he would have less questions to answer. And, with Ponzi schemes, you never ever want the victims to understand how the sausage is made, nor do you want them asking too many questions."    Testimony of Harry Markopolos, CFA, CFE, before the U.S. House of Representatives Committee on Financial Services (Feb. \ 4, 2009) ("Markopolos Testimony") at 7.

50.    As stated above, the Executive Summary indicated to investors that Zeus followed the same "split-strike strategy" marketed by Madoff, but without revealing Madoff's identity.

51.    As subsequently revealed by Madoff's arrest and guilty plea, as well as news reports concerning the due diligence conducted by other financial professionals, the "split-strike conversion" strategy as purportedly used by Madoff was a complete fiction. Moreover, as discussed below, a reasonable amount of due diligence by Defendants would have revealed it as such. This opportunity was not afforded to Plaintiff and the Class themselves because they were not aware of Madoff's identity as the Trading Advisor and Broker for Zeus.

III.   **Defendants Recklessly Missed Or Ignored Numerous Obvious Red Flags Concerning Madoff.**

A.     **Harry Markopolos' Congressional Testimony.**

52.     Harry Markopolos is a chartered financial analyst and derivatives expert with experience managing split-strike conversion strategies who, from May 2000 through 2008, attempted to blow the whistle on Madoff's Ponzi scheme through his own personal investigation and voluntary submissions to the SEC.  Since news of the Madoff scandal broke, Markopolos has been featured on *60 Minutes* and profiled in numerous articles in the financial and popular press with respect to his investigation.  Markopolos' observations, which were summarized in his Congressional testimony described below, boil down to two main themes:  (a) the relatively *un*sophisticated nature of Madoff's fraud, once any meaningful due diligence was applied to it, and (b) the corresponding lack of meaningful due diligence conducted by certain hedge fund managers who, in some cases, invested billions of their investors' funds with Madoff, without disclosing that fact to investors.

53.     Markopolos first began his independent investigation in late 1999, when he was asked by his employer (a competitor to BMIS) to replicate Madoff's apparently successful "split-strike conversion" investment strategy.  Madoff was already well known in the hedge fund world at that time for having apparently managed impressively consistent return streams with unusually low volatility.  This unusually low volatility was attributed to Madoff having very few "negative" months, with the largest price decline in one month a reported minus 0.55%, or barely more than half of one percent.

54.     On studying a sample marketing document from a hedge fund that invested with Madoff, Markopolos "within five minutes" suspected the split-strike conversion strategy as purportedly implemented by Madoff was a "fraud," since "the strategy as described

was not capable of beating the typical percent return on US Treasury Bills less fees and expenses. Once fees and expenses were included, the . . . strategy as depicted [by Madoff] would have had trouble beating a 0% return." Markopolos Testimony at 7. Madoff's strategy, on the other hand, was purportedly "always doing well under all market conditions, which is, of course, impossible." *Id.*

55.     According to Markopolos, Madoff's purported investment strategy included purchasing a basket of 30-35 stocks that closely replicated the S&P 100 stock index. *Id.* at 8. Since fewer than all 100 index stock were purportedly being purchased, larger position weights would have to be taken with respect to those stocks that were purchased, so that each stock may have comprised up to 3.03% of the total portfolio. *Id.* If any one of those stocks were to turn in an "Enron, WorldCom or Global Crossing type of performance" and went to zero, then Madoff should be "down 3.03% for that month." *Id.* As stated by Markopolos, the "odds of a 30-35 stock portfolio not experiencing heavy single stock losses" over a multi-year period "ranged between slim and none." *Id.*

56.     As Markopolos testified, the foregoing conclusions were readily ascertainable from Madoff's own alleged financial reports, which to some extent showed a "startling lack of sophistication." *Id.* at 9. These financial reports were available to Defendants, but not to Plaintiff and the Class.

57.     For one thing, Markopolos testified, Madoff "made a key error in how he presented his performance because he kept comparing himself to the S&P 500 stock index when his strategy purported to replicate the S&P 100 stock index," and "there was a noticeably large difference in price returns between the two indices." *Id.* Further, Madoff's returns purportedly "only had a 6% correlation to the S&P 500 Stock Index" which "was so low as to signal

'FRAUD' in flashing red letters," and would be akin to a "major league baseball player batting .966 and no one suspecting that this player was cheating." *Id.* at 9-10.

58.    In examining Madoff's performance charts, which went up "in nearly a perfectly rising 45 degree angle with no noticeable downturns" for nearly a decade, Markopolos rhetorically asked "what the managers of these feeder funds were thinking as they performed due diligence or even if they were thinking when they performed due diligence. Yes, [Madoff] was a 'no brainer' investment[,] but only in the sense that you had to have no brains whatsoever to invest into such an unbelievable performance record that bears no resemblance to any other investment managers' track record throughout human history." *Id.* at 10.

59.    Apart from presenting an impossibly steady upward trajectory of returns, Madoff's financial statements also purported to show that Madoff was fully invested in U.S. Treasury bills at year-end, every year, and there were thus no investment positions to mark to market. This was another red flag that should have been obvious to any fund manager who was invested with Madoff or contemplated investing with him. As Markopolos testified: "How convenient for a fraudster not to have any trading positions for an auditor to inspect. Since U.S. Treasury bills exist in book-entry form only, how convenient not to have any physical securities on hand to inspect either." *Id.* at 21.

60.    There were yet other indications that Madoff's purported investment strategy was a sham that should have been obvious to managers of feeder funds such as Zeus. Most fundamentally, "there were not enough OEX index options in existence for [Madoff] to be managing the split-strike conversion strategy he purported to be running." *Id.* at 10. Markopolos was able to determine this essential fact in "less than thirty minutes," after assembling the OEX S&P 100 Index Option open interest and volume statistics from the Chicago Board Options

Exchange ("CBOE") as reported in *The Wall Street Journal*'s Money & Investing section. *Id.*

As Markopolos stated in his November 7, 2005 submission to the SEC:

> At my best guess level of BM's assets under management of $30 billion, or even at my low end estimate of $20 billion in assets under management, BM would have to be over 100% of the total [S&P 100] put option contract open interest in order to hedge his stock holdings as depicted in the third party hedge funds marketing literature. In other words, there are not enough index option put contracts to hedge the way BM says he is hedging[.] And there is no way the OTC market is bigger than the exchange listed market for plain vanilla S&P 100 index put options.

61.     In sum, Markopolos testified, Madoff's "math never made sense, his performance charts were clearly deceiving, and his return stream never resembled any known financial instrument or strategy. . . [T]o believe in [Madoff] was to believe in the impossible." Markopolos Testimony at 9.  Nonetheless, that is precisely what Defendants did, in derogation of their duties to Plaintiff and the Class.

**B.      Red Flags About Madoff Were Heeded By Other Finance Professionals But Not By Defendants.**

62.     As Markopolos testified, even a very modest amount of due diligence was sufficient to reveal significant and alarming red flags concerning Madoff's investment activities—red flags which, given further examination, likely would have revealed Madoff to be a fraud.  While Defendants failed to investigate these red flags by conducting necessary due diligence, other investment professionals who advised investors about potential investments with Madoff warned their clients away from Madoff after doing basic due diligence.

63.     For example, in a letter issued to clients on December 15, 2008, Aksia LLC ("Aksia"), an independent hedge fund research and advisory firm, discussed the red flags it had previously identified as early as 2007 which had prompted it to advise clients against investing with Madoff or any of his feeder funds.  Aksia stated in its December 15, 2008 letter

that its judgment not to invest in Madoff's feeder funds had been "swift given the extensive list of red flags," which, according to Aksia, included the following:

(a)    The Madoff feeder funds marketed a purported "split-strike conversion" strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant[itative] analyst.

(b)    It seemed implausible that the S&P 100 options market that Madoff purported to trade [on] could handle the size of the combined feeder funds' assets which we estimated to be $13 billion.

(c)    The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

(d)    There was at least $13 billion in all the feeder funds but our standard 13F review showed scatterings of small positions in small (non-S&P 100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

(e)    Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. The managers had no demonstrated electronic access to their funds['] accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

(f)    Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

(g)    Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.

64.    In a December 12, 2008 article in *The New York Times* entitled "Look Back at Wall St. Wizard Finds Magic Had Its Skeptics," Robert Rosenkranz, a principal at Acorn Partners, an investment advisory firm, stated:  "'Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity' . . . ."

65.    The concerns about Madoff's use of strictly "paper copies" of trading tickets to document trades turned out to be well-founded.  As reported in *The Wall Street Journal* on March 9, 2009, one of Madoff's long-time aides and former personal secretary steadily instructed two clerical employees to generate trading tickets in order to create a false paper-trail for trades that had not actually been executed.  This was accomplished, according to the *Journal*, by researching the daily share prices for blue-chip stocks from "the previous month or several months."  Using the data of past share prices, the aide "would then instruct the assistants to generate 'tickets' showing purported trades, which resulted in gains that were in line with Madoff's steady annual returns."

66.    Jeffrey S. Thomas, Chief Investment Officer at Atlantic Trust, which manages $13.5 billion, said that it had "reviewed and declined to invest with Madoff" prior to December 10, 2008.  The firm said it spotted a number of "red flags" in Madoff's operation, including a lack of an outside firm to handle trades and accounting for the funds and the inability to document how Madoff made profits.

67.    Additionally, an article dated March 13, 2009 from *The New York Times* described James R. Hedges IV, who runs an advisory firm called LJH Global Investments, saying that in 1997 he spent two hours asking Mr. Madoff basic questions about his operation.

"The explanation of his strategy, the consistency of his returns, the way he withheld information— it was a very clear set of warning signs," said Mr. Hedges.

68.     Yet other financial services firms declined to deal with Madoff after doing basic due diligence.   As Markopolos stated in one of his submissions to the SEC, dated November 7, 2005, "Madoff is suspected of being a fraud by some of the world's largest and most sophisticated financial services firms.  Without naming names, here's an abbreviated tally:

> A managing director at Goldman, Sachs prime brokerage operation told me that his firm doubts Bernie Madoff is legitimate so they don't deal with him.
>
> *       *       *
>
> [Royal Bank of Canada] and [Societe Generale] have removed Madoff some time ago from approved lists of individual managers . . . .

69.     Markopolos' information about Societe Generale ("SocGen") was correct. SocGen sent a due diligence team to New York in 2003 to investigate Madoff.  As reported by *The New York Times* on December 17, 2008, in an article entitled "European Banks Tally Losses Linked to Fraud," SocGen concluded that something was not right.  "'It's a strategy that can lose sometimes, but the monthly returns were almost all positive' . . . ."

## C.     **The Financial Press Raised Questions About Madoff's Strategy Years Before His Admissions.**

70.     News of some of these "warning signs" was also being reported in the press years prior to Madoff's admissions, in reports that were ignored and/or unheeded by Defendants.

71.     For example, in May of 2001, an article entitled "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge

fund industry. The article raised significant questions about Madoff's so-called split-strike conversion strategy, as follows:

> [M]ost of those who are aware of Madoff's status in the hedge fund world are baffled by the way the firm has obtained such consistent, nonvolatile returns month after month and year after year.
>
> &ast;     &ast;     &ast;
>
> Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives . . . .
>
> . . . They noted that others who have used the [split-strike conversion] strategy . . . are known to have had nowhere near the same degree of success.
>
> &ast;     &ast;     &ast;
>
> The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period.
>
> &ast;     &ast;     &ast;
>
> In addition, experts ask why no one has been able to duplicate similar returns using the strategy and why other firms on Wall Street haven't become aware of the fund and its strategy and traded against it, as has happened so often in other cases; why Madoff Securities is willing to earn commissions off the trades but not set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself, or conversely, why it doesn't borrow money from creditors, who are generally willing to provide leverage to a fully hedged portfolio of up to seven to one against capital at an interest rate of Libor-plus, and manage the funds on a proprietary basis.

72.     When pressed by the author of the article to truly explain the basis of the split-strike conversion strategy, Madoff replied, "'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

73.     Also in May 2001, *Barron's* reported, in an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so Secretive, He even Asks Investors to Keep Mum," that some "folks on Wall Street think there's more to how Madoff generates his enviable stream of investment returns than meets the eye." The article reported that certain option traders for major investment banks could not understand how BMIS and Madoff achieved the results that they claimed from using the split-strike conversion strategy and were skeptical about how Madoff achieved his double digit returns using options alone. These options traders told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy." *Barron's* reported that private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade" and "[r]emarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year." Madoff responded to *Barron's* questions regarding how he achieved such consistently high returns stating that "[i]t's a proprietary strategy. I can't go into great detail." Madoff feeder fund managers contacted by *Barron's* were similarly elusive, stating "It's a private fund. And so our inclination has been not to discuss its returns."

74.     Each of the red flags heeded by the above-mentioned financial professionals went unheeded by Defendants, to the detriment of Plaintiff and the Class. Had Defendants conducted reasonable and adequate due diligence, they would have detected the fraud based on the red flags and glaring inconsistencies identified by Markopolos and other financial professionals. In fact, given that Zeus had provided Madoff with hundreds of millions of dollars in assets, Defendants had considerably more access than Markopolos to Madoff's operations to detect these red flags. For example, one of Markopolos's critical tests was the confirmation with the supposed counterparties of the trades Madoff claimed to have executed. But, as reported by the *Associated Press* on January 16, 2009, in an article entitled "Madoff fund

may have made no trades," "[T]he securities and brokerage industry self-policing organization, the Financial Industry Regulatory Authority, confirmed that there was no evidence of Madoff's secretive investment fund executing trades through its brokerage operation.   And Fidelity Investments, which had a money-market fund listed among the many trades included in statements Madoff's fund sent to customers, says Madoff was not a client."   Defendants' minimal and reasonable inquiries with Fidelity, or other similar counterparties, would have alerted them to the fraud.

D.     **Defendants' Failures And Breaches Of Duty To The Class.**

75.     In sum, there were numerous warning signs or red flags over the life of Zeus that Defendants failed to investigate, and indeed, completely ignored concerning Madoff's operations, including but not limited to the following:

(a)     There was a clear lack of transparency as to how Madoff produced the returns that he reported.

(b)     Madoff traded through an affiliate rather than an independent broker, contrary to standard industry practice.

(c)     Madoff failed to use a third party custodian to take custody of the securities, as was industry practice.

(d)     Madoff operated through managed accounts rather than setting up a hedge fund of his own, where his fees would have been higher than the brokerage commissions that he was charging.  According to a December 19, 2008 *The Wall Street Journal* article: "This is an unusual arrangement that raised suspicions among rival money managers, some of whom doubted that he could generate sufficient fee income."  It also should have raised suspicions since hedge funds require annual audits, but managed accounts do not.

(e)     BMIS's company auditors were clearly inadequate.  According to news reports, the audit firm that performed the internal audit function was Friehling & Horowitz, which had only three employees – a retired partner living in Florida, a secretary and one active accountant (the retired partner's son-in-law) – which was clearly inadequate to audit an organization purportedly the size of BMIS.

76.     Defendants also failed to investigate Madoff's trading strategies, which also raised red flags.  In particular,

(a)     Madoff had consistently positive returns that bore no relationship to market movements.

(b)     The description of Madoff's "split-strike synthetic conversion" options trading strategy, that purportedly consisted of purchasing approximately 35-50 large-cap stocks that were hedged with equity index options, appeared to be inconsistent with consistently positive returns.

(c)     Madoff's strategy could never be replicated by quantitative analysts who attempted to do so; indeed, it was statistically impossible to do so.

(d)     Madoff's account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in the documents.

(e)     Trading volumes reflected in accounts were vastly in excess of actually reported trading values.  A report issued by Bloomberg estimated that the strategy would have required at least ten times the S&P option contracts that trade on the U.S. exchanges.

77.     Despite all of the red flags described above, Defendants entrusted Madoff with hundreds of millions of dollars of the Class's assets – and collected their corresponding management or administration fees – for years, without conducting the reasonable due diligence

to which Plaintiff and the Class were entitled, without (contrary to their representations) valuing and accounting for the Fund's assets in a manner that was either "fair" or consistent with GAAP or IFRS, and without informing Plaintiff and the Class that their assets had been invested with Madoff.

78.     Defendants' actions with respect to Plaintiff and the Class's assets were not in good faith, were grossly negligent, and fell far short of the legal duties owed to Plaintiff and the Class both before and after their money had been invested in Zeus. Defendants should have known, among other things, that Madoff's investment holdings and returns had not been properly verified, and that the capital belonging to Plaintiff and the Class was not being safeguarded by a reliable custodian, or overseen by a reliable auditor. By failing to investigate and acting in willful blindness towards these clear red flags and the suspicious nature of Madoff's operations and investment results, Defendants breached their fiduciary duties to Plaintiff and the members of the Class, and enabled Madoff to plunder the capital that they had invested with Zeus, thereby injuring Plaintiff and the Class.

79.     Rather than investigate obvious red flags, Defendants acted out of their own self-interest in accumulating capital that generated lucrative management and/or administration fees, for which Defendants provided services of little or no value. The Executive Summary set forth the fee schedule by which certain of the Defendants were compensated for their services, as follows:

(a)     A quarterly "Management Fee" charged by SIAM in advance of up to "0.5% of the NAV of the Company's shares (up to 2.0% per annum) on the first business day of each calendar quarter (after an adjustment is made for reduced fees charged to different classes of shares, if any)";

(b)      Unspecified fees and expenses charged by the Trading Advisor; and

(c)      Unspecified "customary administration and custodian fees" charged by the Administrator (PwC) and Custodian (the Safra Custodian).

## IV.   Zeus' Investors Learned Of Madoff's Role In Zeus Only After His Arrest.

80.     On December 11, 2008, Madoff was arrested by federal prosecutors and charged with operating what he told his sons and investigators was a massive, long-running Ponzi scheme.   According to federal charges, and admitted by Madoff, BMIS fraudulently reported steady, positive returns on billions of dollars in "investments" purportedly being made with investors' assets – including those placed in his custody by Defendants – when, in fact, BMIS had been insolvent for years.

81.     The same day, the SEC filed an emergency action to halt all ongoing fraudulent activities by Madoff and BMIS.   That action is *SEC v. Bernard L. Madoff*, 08 Civ. 10791-LLS (S.D.N.Y. Dec. 11, 2008).

82.     On December 18, 2008, Safra New York sent an "Update on the Madoff fraud case" to Plaintiff and other investors in Zeus.   In that document, Safra New York stated that "many different Madoff feeder funds were available in the market, and some of our clients had invested in such funds.   The facts related to this alleged fraud are unfolding, and we are attempting to obtain the latest information. . . We are closely monitoring the situation with the assistance of outside legal counsel so that we may understand the implications for our clients' investments.   We will keep you informed as we learn further details."

83.     Remarkably, Safra New York did not identify Zeus as one of the very "feeder funds" described in the "Update" distributed on December 18, 2008, nor inform Plaintiff and the Class that BMIS was the Trading Advisor and Broker for Zeus.   Instead, Safra New York

simply reported the NAV of investors' shares of Zeus as zero in subsequent monthly account statements distributed to Plaintiff and the Class.    Indeed, as described further below, spokespersons for the Safra and its affiliates (including Safra New York) continued to publicly deny that Zeus was offered by or affiliated with Safra for months after Madoff's arrest – notwithstanding the facts that investments in Zeus were made through and held in accounts at Safra New York, and the Safra Custodian served as Custodian to the Fund.

84.    Shortly after Madoff's arrest, a trustee (the "SIPC Trustee") was appointed to investigate the alleged trading activities of BMIS and to oversee its liquidation under the Securities Investor Protection Act, or SIPA.    In a question and answer session on February 20, 2009 with investors injured by Madoff's Ponzi scheme, the SIPC Trustee revealed that a review of BMIS' records indicated that BMIS and Madoff had conducted *absolutely no trades* with investors' assets for at least the past thirteen years, which more than encompasses the entire span of Zeus' existence.    What the SIPC Trustee told Madoff's investors, as reported in the *New York Law Journal* on February 23, 2009, was this:  "There wasn't any stock bought or sold.  It was all just made up.  You got somebody else's money."

85.    The SIPC Trustee's findings were subsequently confirmed by Madoff's guilty plea on March 12, 2009.  According to prosecutors, and admitted by Madoff, since at least the early 1990s, BMIS did not purchase securities with the money over which it had custody (including the assets invested in Zeus), but instead simply deposited that money – billions of dollars worth – into an account at Chase Manhattan Bank (now J.P. Morgan Chase) in New York, New York (the "Chase account"), from which BMIS simply paid out redemptions to investors.  These funds were occasionally transferred to a London firm owned and operated by Madoff in order to make it appear (falsely) that BMIS was executing trades in European markets,

but it was then transferred back to the Chase account in order pay off earlier investors and to pay part of BMIS' overhead.

86.    Accordingly, for the duration of Zeus' existence, Madoff and BMIS did nothing more than collect cash and pay redemptions to investors directly out of the principal invested by Plaintiff and the Class.  Defendants, meanwhile, collected substantial fees on those investments as described above.

## V.    Defendants Failed To Follow Applicable Accounting Standards.

87.    The Executive Summary provided that the "value of the assets of the Fund will be determined on the accrual basis of accounting using generally accepted accounting principles, US accounting standards or international financial reporting standards ["IFRS"], unless otherwise deemed appropriate in the discretion of the Director [Defendants]."

88.    Throughout the Class Period, the NAV per share of the Fund was "calculated by the Administrator [PwC]" by "dividing the assets of the relevant Class or Series" of the Fund "less its liabilities by the number of Participating Shares of the relevant Class or Series in issue."

89.    Throughout the Class Period, the NAV of the Fund was reported to Plaintiff and members of the Class, on a monthly basis, as a steadily increasing figure topping off at a purported $1,375.74 per share as of August 28, 2008 (the last NAV date before Madoff's arrest).

90.    Defendants knew that shares of Zeus were not publicly traded and no other independently verified third-party financial information about Zeus was available to Plaintiff and the Class other than the monthly account statements, reports, NAVs and fact sheets provided by Defendants.  Defendants accordingly knew that the information included in these materials would be the primary sources of information to Plaintiff and the Class, and would be relied upon

in their investment decisions with respect to Zeus. Defendants expected and intended investors in Zeus to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of Defendants' valuation of Zeus' assets.

91.     For the reasons described above, the reported NAVs for Zeus throughout the Class Period, which were disseminated to Plaintiff in the Class in their monthly account statements from Safra New York, were false. No securities were ever purchased by the Trading Advisor and Broker on behalf of Zeus. Instead, the money invested by Plaintiff and the Class was used to pay redemptions to other investors and to pay fees to Defendants and BMIS. Had Defendants not utterly failed to abide by the same accounting standards that they pledged to follow in valuing the Fund's assets, they would have known that the reported NAVs misrepresented the actual returns, assets under management, and losses or liabilities of Zeus. Defendants failed to comply with GAAP and IFRS and instead relied on evidence concerning the purported value of Zeus' assets that was generated internally and falsified by a single person who functioned as both the Trading Advisor and Broker for the Fund.

92.     Defendants knew or should have known, among other things, that: (a) Zeus' investments were concentrated in a single third party investment manager, Madoff, who was acting as both the sole Trading Advisor and Broker for the Fund; (b) Zeus' assets bore a materially heightened risk from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (c) Madoff reportedly obtained abnormally high and stable positive investment results; and (d) BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

93.    GAAP and IFRS require due professional care in valuing assets and liabilities. Defendants' valuations with respect to Zeus failed to follow GAAP and IFRS by, among other things:

(a)    failing to understand and/or account for Zeus' and BMIS' internal control structures sufficiently;

(b)    failing to understand and account for related party transactions sufficiently, including the multiple roles being performed by BMIS on behalf of the Fund as both Trading Advisor and Broker;

(c)    failing to obtain sufficient competent evidential matter to support their valuations of Zeus' assets and investments;

(d)    failing to exercise due care in light of the warning signs of fraud by BMIS; and

(e)    failing to ascertain whether BMIS' auditor was familiar with IFRS or GAAP and had conducted its review of BMIS' internal controls in accordance with those standards.

94.    In valuing the Fund's assets, Defendants were relying on the following internal controls being in place and operating effectively:

(a)    the internal controls designed and implemented by the Trading Advisor and Broker (BMIS/Madoff) over the purchase and sale of securities, to confirm trading activity, the receipt and disbursement of cash and security positions, and the physical security of cash and portfolio positions; and

(b)    the internal controls designed and implemented by Zeus' Administrator and Custodian over NAV, cash, portfolio positions and general ledger account reconciliations and certain custodial services for Zeus.

95.    Defendants failed to understand and account for the complete lack of these internal controls.

96.    Indeed, one of the fundamental internal accounting controls is the segregation of non-compatible duties.  Thus, the Broker who initiated the security transactions (Madoff) should have been separate from the Trading Advisor and custodian-in-fact, who was responsible for the delivery and receipt of securities, the collection of income, and the holding and safekeeping of Zeus' assets.  As stated above, Defendants placed the selection of the Broker in the Trading Advisor's hands – and Madoff selected himself.  Had this basic internal control been operating, Defendants could more properly have relied on the information received from BMIS and Madoff as representing a complete record of Zeus' security transactions.  But without the effective operation of this essential internal control, Defendants were unable, with the due care required under GAAP and IFRS, to determine the completeness and accuracy of the security transactions and the physical security of the resulting positions allegedly taken on behalf of Zeus.

97.    The conflict of interest inherent in the overlapping roles of Madoff and BMIS should have been a warning sign to Defendants, yet Defendants disregarded the risk of fraud, in gross negligence and in breach of their fiduciary duties to the Class.

98.    In sum, Defendants who were responsible for valuing the Fund's assets and calculating the Fund's NAV did so in a manner completely inconsistent with GAAP, US accounting standards or IFRS, contrary to their representations to the Class.  Defendants' failures were grossly negligent and not committed in good faith.

VI.   **Safra's Denial Of Its Affiliation With Zeus, And Its Subsequent Offer Of Settlement With Zeus Investors.**

99.    As stated above, for months after Madoff's arrest, spokespersons for Safra and its affiliates (including Safra New York) publicly denied that Zeus was offered by or even affiliated with Safra – notwithstanding the facts that investments in Zeus were made through and held in accounts at Safra New York, and the Safra Custodian served as Custodian to the Fund. Safra went so far in numerous published reports to claim that the only investments it made with Madoff were at its customers' specific, informed requests – a claim that was demonstrably false with respect to Zeus, for which Madoff's role as Trading Advisor and Broker was hidden from investors.

100.    For example, a *Bloomberg* article dated December 16, 2008 entitled "Safra's Private-Bank Clients Bought Madoff Products," reported that Safra denied "having investments with Bernard Madoff," and reported the following:

> Some Safra banks . . . purchased the [Madoff-related] securities for accounts of private-banking clients ***at the request of those customers***, Robert Siegfried, a Safra spokesman with outside public-relations firm Kekst & Co., said today in an email.  Safra didn't invest any bank funds or have any credit exposure to Madoff, he said.

*    *    *

> Siegfried declined to name which Safra banks or clients bought the Madoff products, which he described as ***third-party funds***.
> (emphases added).

101.    In an article in *Business News Americas* dated December 18, 2008, entitled "Fairfield Greenwich, Private Banking Clients' Exposure to Madoff Still Being Tallied," a Safra Group spokesperson was quoted as saying that "Banco Safra had nothing directly invested with Madoff, but some of Safra's other banks around the world may have made purchases of such funds for its clients."

102.   An article by Jonathan Wheatley published in the *Financial Times* on February 17, 2009 entitled "Madoff victims emerge at Safra," reported that Safra continued to deny "any involvement" with Bernard Madoff Securities.  According to the article, "a Safra spokesperson in New York said . . . that ***none of the Safra banks promoted any of the Madoff funds***, although some Safra-family banks outside Brazil did invest in some Madoff funds if customers requested them to do so.  He added:  '***The Zeus fund is not a Safra fund***.'" (emphases added).

103.   On March 11, 2009, in an abrupt departure from its prior denials of "any involvement" with Madoff, Safra began announcing offers of compensation to Zeus investors. According to published media reports, the offers include "perpetual bonds" to be issued by Safra or a Safra affiliate (the "Issuer") in exchange for investors' shares of Zeus.  The bonds to be issued purportedly are to be in an amount equal to investors' initial investments in Zeus, paying interest of allegedly 2% per year.  In exchange for accepting these "perpetual bonds," a Zeus investor gives up all legal claims against Defendants and Safra generally that may be asserted in relation to Zeus.

104.   According to published media reports, these "perpetual bonds" are similar in nature to those offered by another bank, Banco Santander S.A., that recently offered to "settle" its banking customers' claims stemming from Madoff-related investments.  As extensive media reports concerning Banco Santander's offer illustrate, this may make the perpetual bonds subject to a host of limitations that significantly undermine their value, including (among other things) that there may be no obligation on the issuer's part to ever pay the principal of the bonds, and the perpetual bonds may be illiquid and essentially non-transferable.

105.   Notwithstanding the foregoing, Safra has claimed in published reports that its efforts to acquire shares of Zeus has been "well received," to the point that Safra and/or its

affiliates may presently own the majority of Zeus shares.  Published reports estimate that the "restitution" offered by Safra through its offers of compensation may total $40 million.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST ALL DEFENDANTS)**

106.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.  This Count is asserted against all Defendants.

107.    Defendants owed fiduciary duties to Plaintiff and the Class and breached such duties.

108.    The duties expressly assumed by Defendants and owed to Plaintiff and the Class include, *inter alia*:

(a)    The duty to act with reasonable care to ascertain that the information set forth in the written materials, including the Executive Summary, NAVs, monthly reports, account statements, fact sheets, and other presentations communicated to and relied upon by Plaintiff and the Class in making their investment decisions concerning Zeus was accurate and did not contain misrepresentations or omissions of material facts.

(b)    The duty to deal fairly and honestly with Plaintiff and the Class.

(c)    The duty to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the members of the Class.

(d)    The duty to manage the accounts of Plaintiff and the members of the Class and to manage, monitor, and operate the investments exclusively for the best interest of Plaintiff and the members of the Class.

(e)    The duty to make recommendations and execute transactions in accordance with the goals, investment objectives, permissible degree of risk, and instructions of Plaintiff and the members of the Class.

109.    Defendants failed to fulfill their fiduciary duties owed to Plaintiff and the members of the Class in the following respects, *inter alia*:

(a)    Failing to act with reasonable care to ensure that the information set forth in the written materials and other presentations communicated to and relied upon by Plaintiff and the other members of the Class in making their investment decisions concerning Zeus was accurate and did not contain misrepresentations or omissions of material facts;

(b)    Failing to act with reasonable care to provide truthful sales information to Defendants' agents to ensure that the investment opportunity presented to Plaintiff and the Class was suitable and in accordance with their investment goals and intentions;

(c)    Engaging in transactions which resulted in a conflict of interest between Defendants and Plaintiff and the Class whose financial interests Defendants had undertaken to advance, supervise, manage, and protect;

(d)    Profiting and allowing their affiliates to profit at the expense of Plaintiff and the Class;

(e)    Engaging in transactions that were designed to and did result in a profit to Defendants at the expense of Plaintiff and the Class; and

(f)    Failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds.

110.    Defendants have failed to fulfill their fiduciary duties owed to Plaintiff and the Class by acting in bad faith, with gross negligence and in utter disregard for due care and reasonable and prudent investment standards.

111.    As a proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and the Class have sustained damages and have lost a substantial part of their respective

investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

112.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and the Class.

**COUNT II**
**GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

113.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein. This Count is asserted against all Defendants.

114.    As investment managers and/or administrators or custodians with discretionary control over the assets entrusted to them by Plaintiff and the Class, Defendants owed Plaintiff and the Class a duty to manage and monitor the investments of Plaintiff and the Class with reasonable care. Defendants breached this duty.

115.    Defendants further breached their duty of care by failing to:

(a)    Take all reasonable steps to ensure that the investment of the assets of Plaintiff and the Class were made and maintained in a prudent and professional manner;

(b)    Take all reasonable steps to preserve the value of Plaintiff's and the Class's investments;

(c)    Perform all necessary and adequate due diligence; and

(d)    Exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

116.    As a direct and proximate result of Defendants' gross negligence, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT III
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

117.    Plaintiff repeats and reallege the foregoing allegations as if fully set forth herein.  This Count is asserted against all Defendants.

118.    Defendants financially benefited from their unlawful acts which caused Plaintiff and the Class to suffer injury and monetary loss.

119.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner, and each Defendant should pay its own unjust enrichment to Plaintiff and the Class.

120.    Plaintiff and the Class are entitled to the establishment of a constructive trust over the benefits Defendants realized from their unjust enrichment and inequitable conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class, demands judgment against Defendants as follows:

A.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff to be a proper Class representative;

B.    Awarding damages suffered by Plaintiff and the Class as a result of the wrongs complained of herein, together with appropriate interest.  Plaintiff and the Class specifically seek the recovery not only of all the principal initially invested in Zeus, but also all interest and profits which Plaintiff and the Class would have earned had their money been prudently invested;

C.    Awarding Plaintiff and the Class punitive damages, where appropriate;

819862.4

38

D.      Enjoining Defendants from using the assets of Zeus to defend this action or to otherwise seek indemnification from Zeus for their breaches of fiduciary duty, acts of bad faith, and grossly negligent conduct as alleged herein;

E.      Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

F.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 26, 2009

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

Steven E. Fineman, Esq. (SF – 8481)
David S. Stellings, Esq. (DS – 5343)
Daniel P. Chiplock, Esq. (DC – 1137)
250 Hudson Street, 8th Floor
New York, New York  10013
(212) 355-9500

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Richard M. Heimann, Esq.
275 Battery Street, 30th Floor
San Francisco, California  94111
(415) 956-1000

*Attorneys for Plaintiff*